# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
Jun 02 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

| United States of America | ) |
|---|---|
| v. | ) |
| ARNARDO DONEY MARTINEZ, a/k/a "Candas," "Canda," "Cana," a/k/a Hernando Martinez Rodriguez, a/k/a Kevin Martinez, | ) ) ) ) ) |

Case No. 3:21-mj-70929 MAG

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  unknown until December 10, 2020  in the counties of  San Francisco and Alameda  in the Northern District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) | Conspiracy to Distribute and Possess with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

See attached Affidavit of DEA Special Agent Christopher Frasier.

☑ Continued on the attached sheet.

/s
*Complainant's signature*

Approved as to form   /s
AUSA  Sailaja Paidipaty

Christopher Frasier, DEA Special Agent
*Printed name and title*

Sworn to before me by telephone.

Date: 06/01/2021

*Judge's signature*

City and state:  San Francisco, California

Hon. Laurel Beeler, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Christopher Frasier, a Special Agent of the Drug Enforcement Administration (DEA), being sworn, hereby declare as follows:

## INTRODUCTION

1. I submit this Affidavit in support of an application for a criminal complaint charging Arnardo MARTINEZ with violating 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) (conspiracy to distribute and to possess with intent to distribute controlled substances) arising from his participation in a conspiracy to sell fentanyl.

2. The statements in this Affidavit are based on my own investigation; information from other law enforcement agents, investigators, and individuals with knowledge of this matter; my review of documents related to this investigation; and my training and experience as a DEA Special Agent. This Affidavit does not purport to set forth all of the evidence gathered to date in this investigation, or to name all of the persons who participated in these crimes; I have included only those facts and names that I believe are necessary to establish probable cause for the requested criminal complaint and arrest warrant.

## RELEVANT STATUTES

3. Under 21 U.S.C. § 846, it is unlawful for a person to attempt or conspire to manufacture, distribute, or possess with intent to distribute controlled substances, including fentanyl.

4. Under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), it is unlawful for a person to distribute or posses with intent to distribute a mixture or substance containing a detectable amount of fentanyl.

## BACKGROUND OF INVESTIGATING AGENT

5. I am presently employed by the DEA, San Francisco Divisional Office, as a Special Agent (SA), and have been so employed since March 2019. I have been assigned to the Oakland Resident Office since June 2019.

In Re App. for Crim. Complaint                    1

6. As a Special Agent of the DEA, I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law, including drug offenses. As a DEA Special Agent, I am authorized to investigate violations of United States law and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

7. My training as a DEA Special Agent included 550 hours of DEA Basic Agent training which included 120 hours of firearm instruction, 128 hours of defensive tactics, 60 hours of drug investigations and surveillance training and 80 hours of law. I hold a B.S. degree in Criminal Justice Administration.

8. Before joining DEA, I was in the U.S. Marine Corps. As part of my official duties in the Marine Corps, I led over 250 combat patrols in Iraq, while also conducting over 30 different intelligence investigations for suspected individuals engaging in terrorism in Iraq. I held a top secret clearance while in the Marine Corps, allowing me to create intelligence packets on high value individuals. I was also a part of five different investigations into complex attacks on Marines while deployed in Iraq. I developed investigative packets on these attacks by collecting bomb evidence, processing evidence for fingerprinting, as well as obtaining testimony from witnesses.

9. I have also had discussions with other law enforcement officers and confidential informants about the packaging and preparation of narcotics, the methods of operation, and security measures that are often employed by narcotics traffickers. I have examined documentation of various methods in which methamphetamine and other illicit drugs are smuggled, transported and distributed.

10. I have participated in approximately three investigations in which court-authorized Title III interceptions were used in narcotics and/or money laundering investigations. During these investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally

vague language and which were later corroborated by surveillance or defendants' statements, and I have participated in seizures of narcotics and narcotics proceeds that resulted from the monitoring of these types of conversations. I have also interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of the coded language they used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent conversation or would be confused by the conversation since it would not make sense to that person.

11. I have participated in one investigations in which court-authorized Title III interceptions were used in narcotics and/or money laundering investigations. During these investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally vague language and which were later corroborated by surveillance or defendants' statements, and I have participated in seizures of narcotics and narcotics proceeds that resulted from the monitoring of these types of conversations. I also have interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of their coded language used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent.

12. I have been involved in the execution of more than ten state and federal narcotics-related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by traffickers and trafficking

organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of marijuana, heroin, cocaine, methamphetamine, and other controlled substances. I am familiar with and aware of terminology used by illegal drug traffickers concerning narcotics and narcotics dealing.

13. I have interviewed more than seven drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits of drug dealers and users. I have become familiar with the manner in which drug traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellphone technology, coded communications or slang in phone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement.

14. I also have had discussions with other law enforcement officers and confidential informants about the packaging and preparation of narcotics, the methods of operation, and security measures that narcotics traffickers often employ. I have examined documentation of various methods in which heroin, methamphetamine, and other illicit drugs are smuggled, transported, and distributed.

## STATEMENT OF PROBABLE CAUSE

**I.   Overview of Investigation**

15. Since June 2018, Special Agents with the DEA – Oakland Resident Office (ORO) have been investigating fentanyl trafficking in the greater San Francisco Bay Area. During the course of the investigation, agents identified the CRUZ drug trafficking organization (DTO) run by Emilson Jonathan CRUZ Mayorquin and his mother, LEYDIS Yaneth Cruz, (the CRUZ DTO). Agents believe CRUZ, LEYDIS, and their associates, including Pamela CARRERO (CRUZ's sister / LEYDIS's daughter), IVAN Mauro Cruz Mayorquin (another CRUZ family member), Ana MALDONADO (CRUZ's significant other), Adonis TORRES (CARRERO's significant other), Mayer BENEGAS-MEDINA, and others supplied narcotics for resale to multiple local narcotics re-distributors. Members of the DTO also engaged in street-level drug

sales where they sold narcotics to individual drug users. The investigation revealed that many members of the DTO lived in the East Bay, but routinely traveled to the Tenderloin neighborhood of San Francisco to sell drugs on the street.

16. In December 2020, a federal grand jury returned an Indictment charging CRUZ, LEYDIS, CARRERO, IVAN, MALDONADO, TORRES, and BENEGAS-MEDINA with conspiring to distribute drugs. *See* Cr No 20-0480 WHA.

17. The investigation further revealed that Arnardo MARTINEZ (also known as "Candas," "Canda,"[1] "Cana"[2]) supplied the CRUZ DTO with counterfeit pharmaceuticals containing fentanyl. MARTINEZ sold drugs to CARRERO, who in turn sold the drugs to an undercover federal agent (UC). Intercepted communications revealed that MARTINEZ had a continuing relationship with the CRUZ DTO and sold drugs to the organization on credit. Based on my training and experience, I know this to be a common practice in the drug trade called "fronting." Suppliers provide resellers with a bulk quantity of narcotics and are paid for the amount once the drugs are resold.

**II.     MARTINEZ supplied drugs to CARRERO and LEYDIS.**

18. Beginning in July 2020, the UC began purchasing fentanyl from CARRERO and LEYDIS. One of these sales include the purchase of counterfeit pharmaceutical pills that contained fentanyl.

19. During the course of the investigation, the DEA, with assistance from the U.S. Attorney's Office, received Court-authorization on two occasions to intercept wire

---

[1] During this investigation, I reviewed publicly available posts on CARRERO's Facebook account. I saw a video where MARTINEZ (who I recognized from my review of his prior booking photo) was present at what appeared to be a birthday party for CARRERO's son in September 2020. In the post, CARRERO referred to MARTINEZ as "CANDA," As described herein, on intercepted calls, MARTINEZ has also been referred to as "CANA" or "CANDAS." Finally, in the video on CARRERO's Facebook page, I could see that MARTINEZ was driving a white BMW with California license plate 8SYVZ310. A records check indicated that the car is registered to Arnardo Doney MARTINEZ at an address located in El Sobrante, CA.

[2] In addition to these nicknames, I believe that MARTINEZ has used several aliases over the years. I have reviewed his criminal history record which reflects the following aliases: Hernando Martinez Rodriguez, Hernaldo Martinez Roriguez, Arnaldo Martinez Rodriguez, and Kevin Martinez.

communications over telephones used by CRUZ, LEYDIS, CARRERO, and MARTINEZ. *See* Nos. 20-xr-91128 JST, 20-xr-91438 JST.  As described below, the interceptions combined with controlled purchases of narcotics and surveillance established that MARTINEZ supplied the CRUZ DTO with fentanyl.

        **A.**      **On September 16, 2020, MARTINEZ provided pills to CARRERO for sale to the UC.**

        20.      On September 14 and September 16, 2020, the UC and CARRERO exchanged text messages regarding a sale of 1,000 counterfeit pharmaceutical pills.  (These messages were captured and recorded and confirmed by the DEA's recording system).   Prior to September 14, 2020, the UC had purchased "M-30" pills from CARRERO.  "M-30" is a slang term used to reference tablets of oxycodone, a controlled substance.  Pharmaceutical companies mark oxycodone pills with the letter "M" and the number "30."  Based on my training and experience, I know that M-30 pills are frequently trafficked, and that recently, the DEA has seen an increase of counterfeit M-30 pills that contain fentanyl in them.  Pills that CARRERO sold to the UC prior to September 16, 2020, tested positive for the presence of fentanyl.

        21.      At approximately 12:01 p.m. on September 16, 2020, the UC arrived near a park in Oakland to meet with CARRERO.  The UC parked directly behind CARRERO's vehicle.  I then saw CARRERO get into the UC's vehicle on the front passenger's-side door.  Based on my conversation with the UC, and my review of footage recorded during the transaction, I understand that once in the vehicle, CARRERO handed the UC a white cardboard cell phone box.  The UC stated, "My buddy called. Can you get 500 more? Can you call the person real quick or no?"  CARRERO asked, "5 what?"  The UC stated, "500 more of these. Can you get 500 …"  As the UC made this statement, he opened the white cardboard cell phone box and observed approximately 1,000 blue circular M-30 pills.  CARRERO stated, "500 more?"  When she asked the question, CARRERO pointed to the white cardboard cell phone box, indicating that she was asking if the UC wanted 500 more of the type of pills that were in the box that she handed over.  The UC answered "Yeah. Can you call your guy right now and see if you can do

In Re App. for Crim. Complaint                              6

it? Or let me talk to him and I'll do it." CARRERO stated, "Maybe."

22. At approximately 12:09 p.m., agents intercepted a phone call involving a conversation between CARRERO and MARTINEZ[3]. The following are relevant excerpts that I believe relate to drug trafficking:[4]

| | |
|---|---|
| CARRERO: | Hello. |
| MARTINEZ: | Hello, hello. |
| CARRERO: | How are you, Cana? |
| MARTINEZ: | Good, good, and you? |
| CARRERO: | All good. Hey, I was going to ask, do you have more pills there, but like right now? |
| MARTINEZ: | Yeah, I have some there…I have a thousand (1,000) right now there at the house. |
| CARRERO: | Uh-huh. |
| MARTINEZ: | Well, close by. |
| CARRERO: | Do you think you could bring uh…five-hundred (500)? |

---

[3] At the time of this communication, I believe MARTINEZ was using a phone number ending in -5327. Pursuant to the Court's order, agents were intercepting communications over that phone line. *See* No 20-xr-91438 JST. A records check for information related to the -5237 number revealed that the number had been listed as a contact phone number on a wire transaction in the name of Arnardo Doney MARTINEZ in August 2020. Also, on November 20, 2020, an officer of the San Francisco Police Department (SFPD) conducted surveillance of MARTINEZ. During that surveillance, the officer placed a call to the -5237 number and saw MARTINEZ lift his phone at the time that the call was placed. Finally, as described above, during this call, CARRERO asked MARTINEZ for another 500 pills to resell to the UC. MARTINEZ indicated that he would send his "guy." An unknown male subsequently arrived with the additional drugs at the location where CARRERO and the UC were waiting. A records check revealed that the car that the runner was driving was registered to Arnardo Doney MARTINEZ at the same address in El Sobrante, California where MARTINEZ'S BMW (that was depicted at CARRERO's house in the social media post) is registered. Taken together, I believe that MARTINEZ used the -5237 number.

[4] Unless otherwise noted, all of the calls intercepted during this investigation were originally in the Spanish language. Spanish linguists reviewed the interceptions and have prepared preliminary summaries and/or transcripts of the calls. I am relying on these summaries/transcripts to form my conclusions within this affidavit. The summaries/transcripts may undergo additional review and revision, and the finalized translations may slightly differ from the language quoted herein

| | |
|---|---|
| MARTINEZ: | Okay, right now let me call the guy to have him count them there and have him take them to you right now. |
| CARRERO: | All right, then, I'm… I'm going to send you the address to the park where I am at. |
| MARTINEZ: | Ah okay, that's fine. |
| CARRERO: | Mmhm. |
| MARTINEZ: | I will tell him right now…Send me the address right now. |
| CARRERO: | Okay, I'll send it to you right now. |
| MARTINEZ: | All right, then. |
| CARRERO: | All right, then. |

23. Based on my training and experience and participation in this investigation as well as prior investigations of narcotics trafficking in the Bay Area and my review of subsequent phone calls, I believe that when CARRERO asked for 500 more, that she was asking CANA (or CANDA as I previously saw on her Facebook profile) if he could supply her with 500 more M-30 pills based on the request by the UC for additional pills. Based on the context of the conversation, particularly that MARTINEZ ("CANA") knew what CARRERO was asking for when she asked about additional pills and did not ask for any clarification, I believe that MARTINEZ regularly supplied CARRERO with pills for illegal sale. I further believe that MARTINEZ was indicating that he would have a third party ("the guy") ultimately count the pills and deliver them. Based on my training and experience, I know that mid-level drug suppliers often utilize "runners" or drug couriers to deliver drugs from one location to another. This minimizes risk to the mid-level trafficker of getting stopped by police or otherwise apprehended by law enforcement.

24. At approximately 12:20 p.m., agents intercepted a phone call where CARRERO, placed another outgoing call to MARTINEZ. CARRERO asked "what the guy said." MARTINEZ said that "he' would be there in five minutes.

25. Based on my review of the prior messages and my knowledge of subsequent

events, I believe that MARTINEZ was indicating that the "runner" would arrive with the additional pills in approximately five minutes.

26. At approximately 12:30 p.m., CARRERO placed an outgoing call to MARTINEZ via WhatsApp. The UC could overhear CARRERO direct MARTINEZ to provide CARRERO with the telephone number to his "runner." The UC could hear CARRERO describe the UC's vehicle to MARTINEZ and direct him to tell the runner of CARRERO's location.

27. At approximately 12:32 p.m., I observed a Dodge four-door vehicle, bearing California license plate number 8SKV268, park a few car lengths away from the UC's vehicle.[5] At the same time, I observed CARRERO exit the UC's vehicle and walk towards the Dodge. I then saw CARRERO open the driver's-side door of the Dodge and reach into the front seat of the car. CARRERO then left the area where the Dodge was parked and re-entered the UC's vehicle. Once inside the UC's vehicle, CARRERO handed the UC a clear plastic sandwich bag that appeared to contain approximately 500 M-30 pills. The UC handed CARRERO $4,000 in Official Advanced Funds and stated "Cuatro." (Cuatro is the Spanish word for "four.") CARRERO answered "Ok." At approximately 12:35 p.m., CARRERO exited the UC's vehicle and departed the area in her vehicle.

28. Based on my training and experience and participation in this investigation, I believe that MARTINEZ's runner arrived in the Dodge (that is registered to MARTINEZ) with the additional pills and that CARRERO retrieved those drugs from the runner's car and then sold them to the UC.

29. Both sets of pills were sent to the DEA Western Laboratory and tested positive for the presence of fentanyl.

**B.   Intercepted calls confirmed that MARTINEZ regularly sold drugs to the CRUZ DTO.**

30. Calls intercepted over LEYDIS's phone indicate that MARTINEZ regularly

---

[5] A records check revealed that the Dogde is registered to Arnardo Doney MARTINEZ at an address in El Sobrante, CA.

supplied drugs to the CRUZ DTO.  For example, on October 31, 2020, LEYDIS spoke with an unknown male using a phone number ending in -7303 (UM-7303).  LEYDIS said that she owed money to MARTINEZ (who she referred to by MARTINEZ's nickname, CANDAS) because he had "sent" her "one" and that she owed him.  LEYDIS said she saw MARTINEZ the prior night and she "only" gave him "200" because the "situation" was "tough" now.  Based on my training and experience and context of the call, I believe that MARTINEZ provided LEYDIS with one unit of a drug and that LEYDIS anticipated paying MARTINEZ once the drug was sold.  Based on the context of the conversation, I believe LEYDIS re-paid MARTINEZ $200 for the drugs provided, but still owed him money.  I believe that when she stated that the "situation" was "tough," she meant that she was having difficulty selling the drug to fully repay MARTINEZ.

### III. In addition to selling multiple types of fentanyl, MARTINEZ sells other drugs, including heroin and methamphetamine.

31. Intercepted calls over MARTINEZ's phone indicate that he sells multiple types of fentanyl as well as other drugs.  For example, on October 28, 2020, an unknown male using a phone number ending in -5243 (UM-5243) called MARTINEZ and asked what he had.  MARTINEZ responded that he only had "purple, "yellow," "black," and "crystal."  The UM asked if MARTINEZ had "blue."  MARTINEZ said he did not.  Based on my training and experience, and my involvement in this investigation, I know that fentanyl is often referred to by drug traffickers by the color emitted when the drug is burnt.  The investigation revealed that common varieties of fentanyl include blue, pink, yellow, and purple.  Different colors typically signify different levels of quality and potency.  During this investigation, I learned that blue fentanyl is considered to be the highest in quality.  Further, based on my training and experience, I know that "black" is a common code word for heroin because heroin is often dark brown or black in color.  Finally, based on my training and experience, I know that "crystal" is a shorthand for methamphetamine or "crystal methamphetamine."  Therefore, during this call, I believe that MARTINEZ indicated that he had two types of fentanyl available for resale, in addition to heroin and methamphetamine.

32.     UM-5243 went on to ask about the price per ounce.  MARTINEZ said he would give it to the UM-5243 for "600."  UM-5243 ordered "a half" each of the "yellow," "black," and "purple."  For the reasons stated above, I believe UM-5243 was ordering half an ounce of yellow fentanyl, half an ounce of purple fentanyl, and half an ounce of heroin.

33.     Intercepted calls indicate that later that day at approximately 11:05 p.m., MARTINEZ and the UM-5243 met near a Walgreens in San Francisco for the sale.

## CONCLUSION

34.     I believe based on the foregoing facts that there is probable cause to believe that the Arnardo MARTINEZ has conspired with others to distribute controlled substances, in violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

/ s
_____
Christopher Frasier
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this  1st  day of June 2021.

_____
HONORABLE LAUREL BEELER
United States Magistrate Judge